IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| TARA MIA BRADLEY, | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 4:16-cv-26 |
| v. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| NANCY A. BERRYHILL, | ) | |
| Commissioner of Social Security, | ) | By:    Joel C. Hoppe |
| Defendant. | ) | United States Magistrate Judge |

Plaintiff Tara Mia Bradley asks this Court to review the Commissioner of Social Security's ("Commissioner") final decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act (the "Act"), 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). ECF No. 10. Having considered the administrative record, the parties' briefs, and the applicable law, I find that the Commissioner's decision is not supported by substantial evidence. Therefore, I recommend that the Court **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, and **REMAND** this case for further administrative proceedings.

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. *See* 42 U.S.C. § 405(g); *Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, the Court asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and

1

whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id*., but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review takes into account the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); 20 C.F.R. §§ 404.1505(a), 416.905(a). Social Security ALJs follow a five-step process to determine whether an applicant is disabled. The ALJ asks, in sequence, whether the applicant (1) is working; (2) has a severe impairment; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461

U.S. 458, 460–62 (1983); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The applicant bears the burden of proof at steps one through four. *Hancock*, 667 F.3d at 472. At step five, the burden shifts to the agency to prove that the applicant is not disabled. *See id.*

## II. Procedural History

Bradley applied for DIB and SSI on April 23, 2014, alleging disability caused by fibromyalgia, arthritis, neuropathy, anxiety, depression, inflammatory disease, and joint disorder. Administrative Record ("R.") 61, 75, ECF No. 13. She alleged onset of her disability as October 25, 2013, at which time she was forty-one years old. *Id.* Disability Determination Services ("DDS"), the state agency, denied her claims at the initial, R. 61–88, and reconsideration stages, R. 91–124. On October 19, 2015, Bradley appeared with counsel at an administrative hearing before ALJ William Barto, and the ALJ heard testimony from Bradley and Andrew V. Beale, Ed.D., a vocational expert ("VE"). R. 38–60.

ALJ Barto denied Bradley's claim in a written decision issued on November 6, 2015. R. 15–31. He found that Bradley had severe impairments of osteoarthritis, fibromyalgia, status post right hip labral repair, right carpal tunnel syndrome, right radial styloid tenosynovitis/intersection syndrome, and affective disorder. R. 17. He determined that other impairments established in the record, including history of irritable bowel syndrome, obesity, umbilical hernia status post repair, and anxiety disorder, were non-severe. R. 17–18. At step three, the ALJ found that none of Bradley's impairments, alone or in combination, met or medically equaled the severity of a listed impairment. R. 18–19. In evaluating her mental impairments under the listings, the ALJ determined that Bradley had mild restriction in activities of daily living, moderate difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. R. 19.

As to Bradley's residual functional capacity ("RFC"), ALJ Barto found that she could

perform light work[1] with frequent climbing of ramps or stairs; occasional stooping, kneeling,

crouching, and crawling; no climbing of ladders, ropes, or scaffolds; and frequent handling or

fingering bilaterally. R. 20–29. He also assessed non-exertional limitations, finding that she

could perform simple, routine, repetitive tasks involving occasional interaction with supervisors

and the general public, occasional interaction with coworkers but without tandem assignments or

group work, and a static workplace with infrequent change that is explained in advance. *Id.*

Based on this RFC and the VE's testimony, the ALJ found that Bradley could not perform her

past relevant work as a pharmacy technician, but she could perform other light jobs existing in

significant numbers in the national and regional economies, including cleaner and laundry

worker. R. 29–30. He therefore determined that Bradley was not disabled. R. 30. The Appeals

Council denied Bradley's request for review, R. 4–6, and this appeal followed.

### III. Discussion

Bradley challenges the ALJ's determination of her RFC—the most she can do on a

regular and continuing basis despite her impairments, 20 C.F.R. §§ 404.1545(a), 416.945(a);

SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). Specifically, she contends that the ALJ failed

to account for her moderate limitations in concentration, persistence, or pace, Pl.'s Br. 14–17,

ECF No. 16; did not discuss the degree to which her obesity further limited her functioning, *id.* at

17–19; and erroneously credited the medical opinions[2] of the DDS reviewing experts over those

---

[1] "Light" work involves lifting no more than twenty pounds at a time, but frequently lifting objects
weighing ten pounds. 20 C.F.R. §§ 404.1567(b), 416.967(b). A person who can meet these lifting
requirements can perform light work only if she also can "do a good deal of walking or standing, or do
some pushing and pulling of arm or leg controls while sitting." *Hays v. Sullivan*, 907 F.2d 1453, 1455 n.1
(4th Cir. 1999).

[2] "Medical opinions are statements from acceptable medical sources that reflect judgments about the
nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and

offered by treating and examining sources, *id.* at 19–24. Because I recommend remand as to the first of these objections, I will limit my discussion to Bradley's mental functioning, specifically her limitations in the area of concentration, persistence, or pace, resulting from her pain and psychological impairments.

A.      *Relevant Facts*

Bradley's medical record reflects continual treatment for chronic, diffuse pain of unclear etiology, beginning with complaints of pain in her right hip in January 2013, R. 1360–62. By October 2013, Bradley also began to complain of pain in her knees, lower back, neck, and hands. R. 451–61. Over the course of her treatment, she saw providers in a number of specialties, including rheumatology, orthopedics, neurology, and pain management, who struggled to identify a unifying diagnosis for her symptoms.[3] *See* R. 552, 557, 560 (October 28, 2014, treatment note describing Bradley's treatment history up to that time). Bradley's treatment took various forms. For her right hip pain, she underwent arthroscopy with labral repair, acetabular rim trimming, femoral osteochondroplasty, and capsular repair, R. 927–33; received steroid injections and nerve blocks, R. 802, 804–06, 1199, 1222–23, 1351–52; and attended multiple courses of physical therapy, R. 365–413, 1154–61, 1174–80, 1192–93, 1201–02, 1217–18, 1229–30, 1426–43. Bradley's bilateral hand and wrist pain was treated with injections, R. 1108–09, 1145, 1172; occupational therapy, R. 717–40, 1203–04, 1209–10, 1224–25, 1424; and use of

---

prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(1), 416.927(a)(1).

[3] Although Bradley's symptoms were consistent with fibromyalgia, she also had elevated inflammatory markers (specifically, sedimentation rate and C-reactive protein) suggestive of an underlying connective tissue disorder. *See* R. 507, 560, 1066, 1072. Rheumatologic workup, however, was negative for any autoimmune process. *See* R. 915–16, 969, 1105. Other impairments were also diagnosed during the relevant period and were noted to contribute to Bradley's pain, including right hip labral tear and mixed femoroacetabular impingement, R. 927; superimposed meralgia paresthetica, R. 1235; lumbar facet arthropathy, *id.*; carpal tunnel syndrome, R. 970; and radial styloid tenosynovitis/intersection syndrome, R. 1144.

splints and compression gloves, *see* R. 690, 720, 970, 1354. She received steroid injections for

her lower back pain, R. 1092–1100, and trigger point injections for pain in her upper back, *see* R.

1342. In addition, Bradley was prescribed a variety of pain medications. *See, e.g.*, R. 1342

(August 6, 2015, pain management record noting that Bradley was currently taking Celebrex,

Voltaren, Flexeril, Cymbalta, Wellbutrin, and Elavil). In spite of these interventions, Bradley

continued to complain of chronic pain throughout the course of her treatment.

Bradley also received treatment for mental health symptoms that arose as her pain

progressed without resolution. On April 9, 2014, on referral from her primary care physician, she

presented to Devika Fiorillo, M.A., a medical student at Duke Medicine ("Duke"), for a

psychosocial evaluation regarding her chronic pain. R. 567–76. She reported taking medications

for anxiety and receiving psychotherapy in the past, with her last mental health visit occurring

the previous year.[4] R. 570. Bradley described experiencing mood swings, loss of interest in

activities and being around others, difficulties with concentration and memory, and trouble with

falling and staying asleep. *Id.* She noted that these symptoms were more significant than in the

past, but she did not experience them all day nearly every day. R. 573. Ms. Fiorillo observed that

Bradley was attentive and oriented during her interview, R. 570, and she had intact attention and

concentration, R. 576. Psychometric testing indicated that she experienced strain in her family

relationships, difficulty relying on others, moderate symptom distress, higher than average

anxiety, and mild depressive symptomatology. R. 572–73. Her predominant stressors were her

chronic medical impairments and concern about her ability to return to work. R. 574. Ms.

---

[4] This reference to past treatment may refer to a January 28, 2013, visit with Shailesh Balasubramanian, M.D., her primary care physician at Duke, during which she complained of memory loss and difficulty concentrating and reported that Cymbalta was improving her baseline anxiety. R. 767–72. Dr. Balasubramanian observed that Bradley did not make eye contact and had a flat affect with emotional lability, which he thought to be unusual. R. 771. He referred her for psychiatric evaluation, *id.*, but there is no record of any such visit until Bradley saw Ms. Fiorillo more than a year later.

Fiorillo assessed Axis I diagnoses of depressive disorder not otherwise specified and anxiety disorder not otherwise specified, and she noted a GAF score of 58.[5] *Id.* She stated that Bradley could benefit from coping skills training and psychotherapy in order to manage her pain and recommended that Bradley pursue cognitive-behavioral therapy. R. 574–75.

Bradley thereafter attended regular therapy sessions at Duke with Abigail Keys, Ph.D., and Christopher Edwards, Ph.D. R. 578–97, 1271, 1318–19, 1327–28, 1339. She continued to complain of stress caused by her pain, unclear diagnosis, financial difficulties, and family relationships. *See generally id.* Despite Bradley's complaints, however, Dr. Keys and Dr. Edwards routinely noted unremarkable objective findings: she was cooperative, with mostly normal mood and affect,[6] normal intelligence and executive functioning, and intact memory, attention, and concentration. *See* R. 594, 596, 1271, 1318, 1327–28, 1339. On March 15, 2015, Dr. Keys completed an evaluation of Bradley's mental functioning. R. 667–70. She opined that Bradley had unlimited or very good ability to follow work rules and simple instructions, but she

---

[5] GAF scores represent a "clinician's judgment of the individual's overall level of functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (4th ed. 2000) (*DSM-IV*). The GAF scale is divided into ten 10-point ranges reflecting different levels of symptoms or functioning, with 1–10 being the most symptomatic or least functional, and 91–100 being the least symptomatic or most functional. *See id.* The ranges do not distinguish between symptoms and functional impairments. *See id.* Thus, when "the individual's symptom severity and level of functioning are discordant, the final GAF [score] always reflects the worse of the two." *Id.* at 32–33. A GAF score of 51–60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." *Id.* at 34.

The American Psychiatric Association now cautions that GAF scores do not adequately convey the information needed to assess an individual's mental state, functional capacities, or treatment needs over time, and it recommends that clinicians cease using them for assessment. *See* Am. Psychiatric Ass'n, *Frequently Asked Questions About DSM-5 Implementation—For Clinicians* (Aug. 1, 2013), http://www.dsm5.org/Documents/FAQ%20for%20Clinicians%208-1-13.pdf. Though GAF scores may be questionable diagnostic tools, changes in assessed scores may still reflect a clinician's observation of improvement or deterioration in their patient.

[6] Dr. Keys, however, sometimes noted that Bradley presented with abnormal mood, describing it as "anxious, dysthymic, and frustrated," R. 594, "depressed," R. 1271, and "anxious, frustrated, and irritable" with anxious affect, R. 1339.

was limited in her ability to function independently, follow detailed instructions, and demonstrate reliability, and she was severely limited in her ability to follow complex instructions, deal with work stresses, and maintain attention and concentration.[7] R. 667–68. She noted that Bradley's pain, anxiety, and depression caused her to experience excessive worry, racing thoughts, and significant difficulty with comprehension, memory, organizing her thoughts, and retaining information. R. 668. Dr. Keys stated that Bradley's impairments would be severe enough to interfere with the attention and concentration needed to perform even simple work tasks, and she would likely have to miss more than three days of work per month and take unscheduled breaks during the workday. R. 669.

Christopher Cousins, Ph.D., conducted a consultative examination of Bradley's mental functioning on January 29, 2015. R. 599–604. Bradley reported that she was receiving mental health treatment in the form of counseling and biofeedback, but she did not report any history of inpatient psychiatric hospitalization. R. 601. Dr. Cousins noted that no psychiatric records were available for review, but Bradley's medical records stated she had a history of anxiety. *Id.* He observed that Bradley related to him in a rather distant manner and did not maintain eye contact. R. 602. She had a restricted affect and depressed, slightly irritable mood. *Id.* Bradley exhibited somewhat sulky demeanor, irritable and annoyed facial expressions, and psychomotor retardation. *Id.* She reported feeling happy when she could pay her bills, but feeling like crying on most days because she could not do things she used to be able to do. *Id.* On examination, she displayed fair recent memory and fair-to-good remote memory, but her immediate memory was poor, as indicated by her inability to remember Dr. Cousins's instructions to recite a series of digits backwards. *Id.*

---

[7] That same day, Dr. Keys held a therapy session with Bradley and observed that her attention and concentration were intact. R. 1318.

Dr. Cousins diagnosed depressive disorder because of multiple chronic health problems with major depressive-like episode, and he noted a rule-out diagnosis of major depressive disorder, recurrent, moderate. R. 603. He found that Bradley's clinical presentation and symptoms were consistent with an individual experiencing depression, and he observed no evidence of malingering or symptom exaggeration. *Id.* He explained that his diagnosis was based on the relationship between Bradley's depression and her chronic health problems, and he reasoned that her depression would continue if her health difficulties persisted, which would make major depression a more accurate diagnosis. *Id.* He opined that Bradley was capable of performing some simple and repetitive tasks, but her ability to perform detailed and complex tasks was "significantly compromised," as evidenced by the "pronounced difficulties" with concentration exhibited during the examination. *Id.* He determined that she would "likely require[] special instructions or additional supervision in performing unfamiliar tasks." *Id.* Dr. Cousins further stated that because of her depression, he expected Bradley to have "significant difficulty" with maintaining regular workplace attendance and completing a normal workday or workweek without interruption. *Id.* He also opined that Bradley may have some difficulty interacting with others in a workplace setting, and she would have "significant difficulty" in coping with work-related stresses. R. 603–04.

On January 30, 2015, as part of the initial review of Bradley's claims, DDS reviewing expert Eric Oritt, Ph.D., produced an opinion as to her mental functioning, noting that she would have moderate difficulty in maintaining concentration, persistence, or pace. R. 67, 70–71, 81, 84–85. In particular, he found that Bradley would be markedly limited in her ability to carry out detailed instructions (although not significantly limited in carrying out very short and simple instructions or making simple decisions), and moderately limited in the areas of maintaining

attention and concentration for extended periods, performing activities within a schedule, maintaining regular attendance, being punctual within customary tolerances, sustaining an ordinary routine without special supervision, working in coordination to others without being distracted by them, completing a normal workday or workweek without interruptions from her symptoms, and performing at a consistent pace without an unreasonable need for breaks. R. 70–71, 84–85. On reconsideration, in an opinion dated June 22, 2015, DDS reviewer Sreeja Kadakkal, M.D., affirmed Dr. Oritt's pertinent findings, except Dr. Kadakkal found that Bradley would not be significantly limited in her ability to sustain an ordinary routine without special supervision. R. 99, 102–04, 116, 119–21.

In her testimony before the ALJ, Bradley stated that after the onset of her chronic pain symptoms, her concentration deteriorated and she began making mistakes at work. R. 47. She stated that her difficulty with concentrating caused her to misplace items and to "do[] things that [she] shouldn't do" while driving. R. 53–54. She reported watching television as a distraction from her pain, but said she did not focus on what she was watching. R. 54.

B.    *ALJ Barto's Decision*

In his written opinion, ALJ Barto explained his step-three finding that Bradley had moderate difficulties in maintaining concentration, persistence, or pace by noting that Bradley's therapy notes showed that she exhibited intact attention, concentration, memory, and intelligence, and other medical records generally showed that she was alert and oriented on examination. R. 19. With regard to the opinion evidence, the ALJ found that Dr. Cousins's opinion was inconsistent with Bradley's "fairly limited" mental health treatment and generally unremarkable mental status examinations, and he gave this opinion "some weight," incorporating Dr. Cousins's conclusions into the RFC in part. R. 27. He gave "partial weight" to Dr. Keys's

10

opinion, finding that her statements as to Bradley's likely absences from work, need for

unscheduled breaks, and ability to perform simple work tasks were not well supported. R. 28. He

found that Dr. Keys's finding that Bradley's impairments would interfere with the attention and

concentration necessary to perform simple work tasks was inconsistent with her statement that

Bradley had unlimited/very good ability to follow simple job instructions. *Id.* He also noted that

Dr. Keys's finding that Bradley was unable to maintain work attendance was inconsistent with

her own treatment notes, which indicated grossly normal examination findings. *Id.* Finally, he

considered the opinions of the DDS experts, noting that the initial reviewer found that Bradley

could complete simple, repetitive tasks and should have minimal interaction with the public, and

the reconsideration reviewer found that Bradley could complete simple, unskilled work. R. 28–

29. The ALJ determined that these opinions were generally consistent with the record and

afforded them great weight, with the most weight given to the initial assessment because it

"better defined [Bradley's] mental limitations." R. 29.

C.      *Analysis*

Bradley's objection to the ALJ's findings as to concentration, persistence, or pace

invokes the Fourth Circuit's opinion in *Mascio v. Colvin*, 780 F.3d 632 (4th Cir. 2015). In

*Mascio*, the court considered whether the ALJ erred by adopting as the RFC a hypothetical posed

to the VE that did not include any mental limitations other than a restriction to unskilled work,

despite having found at step three that the claimant had moderate difficulties in maintaining

concentration, persistence, or pace. *Id.* at 637–38. The court found that the limitations included

in the RFC were narrower than those identified by the ALJ at step three. It reasoned that "an ALJ

does not account 'for a claimant's limitations in concentration, persistence, and pace by

restricting the hypothetical to simple, routine tasks or unskilled work'" because "the ability to

11

perform simple tasks differs from the ability to stay on task." *Id.* at 638 (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011)). Finding that the ALJ failed to give any explanation of why his step-three finding did not translate into a work-related limitation in the RFC, the court determined that remand was necessary. *Id.*

Here, unlike in *Mascio,* the ALJ provided for other limitations in his RFC beyond a restriction to simple, unskilled work. Namely, he found that Bradley should be limited to work that is repetitive and routine, involves only occasional interaction with others, and is performed in a static environment with infrequent change that is explained in advance. R. 20. The Commissioner argues that these restrictions sufficiently account for the moderate limitations in concentration, persistence, or pace identified by the ALJ at step three and that the record does not warrant additional limitations. *See* Def.'s Br. 16–19, ECF No. 21. The Commissioner is correct to observe that the treatment record is relatively unremarkable as to Bradley's ability to pay attention and concentrate. It is not enough, however, that the ALJ's RFC finding comports with many of the treatment notes; rather, *Mascio* also demands that the ALJ resolve conflicting evidence and provide a coherent, consistent analysis that enables the reviewing court to ascertain the reasons for his finding. *See* 780 F.3d at 637–38.

In this case, the confusion largely arises from the ALJ's cursory explanation of his step-three finding of moderate limitations in concentration, persistence, or pace. Although he attempted to explain this determination by pointing to Bradley's generally normal examination findings, it is unclear how the cited evidence supports the ALJ's finding that Bradley had any limitation, let alone a moderate one, in this area of functioning. *Cf. Claiborne v. Comm'r*, No. SAG-14-1918, 2015 WL 2062184, at *4 (D. Md. May 1, 2015) (stating that the ALJ's findings at steps two and three should represent a well-reasoned consideration of the evidence and that these

12

steps are "not simply an opportunity to give the claimant the benefit of the doubt at one step while taking it away at the next step"). Had the ALJ sufficiently explained his reasoning at this step, the Court could better understand what Bradley's moderate difficulties in concentration, persistence, or pace entailed and could then assess whether the restrictions in the RFC adequately accounted for these limitations.

This ambiguity as to the scope of Bradley's limitations is compounded by the ALJ's RFC analysis, specifically his treatment of the opinion evidence. An ALJ must explain the weight given to all medical opinions, *Radford v. Colvin*, 734 F.3d 288, 295–96 (4th Cir. 2013), and his "decision 'must be sufficiently specific to make clear to any subsequent reviewers the weight [he] gave' to the opinion and 'the reasons for that weight,'" *Harder v. Comm'r of Soc. Sec.*, No. 6:12cv69, 2014 WL 534020, at *4 (W.D. Va. Feb. 10, 2014) (quoting SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996)). Here, however, the ALJ's reasoning for the weight he gave to some of the opinions is not altogether clear. In particular, the ALJ gave reduced weight to Dr. Keys's opinion at least in part because he found that the record did not support limitations in Bradley's ability to maintain attendance or work through the day without an unreasonable need for breaks; nevertheless, he also gave the greatest weight to the opinion of Dr. Oritt, who similarly found that Bradley was limited in these areas. The ALJ did not clarify this discrepancy. Nor did he explain how he accounted for Dr. Oritt's finding that Bradley would be moderately impaired in her ability to maintain attention and concentration for extended periods.

Moreover, the ALJ did not explain whether the various non-exertional restrictions in the RFC were included to address Bradley's limitations in concentration, persistence, or pace, or whether they related to some other area of functioning, such as social interaction or stress tolerance. As *Mascio* noted, the ability to perform skilled or detailed work is distinct from the

ability to stay on task. 780 F.3d at 638. A claimant who is capable of understanding and performing simple and unskilled work activities may not be able to maintain sufficient concentration to do those activities consistently over a regular workday or workweek. Similarly, restrictions that limit the level of social interaction or changes in the workplace that a claimant experiences do not necessarily alleviate difficulties she may have with focusing, staying on task, or maintaining a consistent pace. It was therefore necessary for the ALJ to explain the scope of the limitations he identified at step three. His failure to provide such an explanation and to "build an accurate and logical bridge from the evidence to his conclusion," *Monroe v. Colvin*, 826 F.3d 176, 189 (4th Cir. 2016) (quoting *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)), necessitates remand.

As to Bradley's other objections, on remand, the ALJ should discuss the effect of her obesity to the extent it causes limitations beyond those already established by her other impairments. He should also fully explain his treatment of the medical opinions in the record, taking care in particular to evaluate Bradley's fibromyalgia in accordance with SSR 12-2p, 2012 WL 3104869 (July 25, 2012).

IV. Conclusion

For the foregoing reasons, I find that the Commissioner's final decision is not supported by substantial evidence. Accordingly, I respectfully recommend that the Commissioner's Motion for Summary Judgment, ECF No. 20, be **DENIED**, this matter be **REMANDED** for further administrative proceedings, and this case be **DISMISSED** from the Court's active docket.

**<u>Notice to Parties</u>**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such

proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the Honorable Jackson L. Kiser, Senior United States District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: August 9, 2017

Joel C. Hoppe
United States Magistrate Judge